Mr. Harrah, whenever you are ready Your honors, may it please the court, my name is Glenn Harrah, I represent the plaintiff, Carleton & Harris Chiropractic, Inc. We are here on the District Court's dismissal of our case for failure to state a claim in this case under the Telephone Consumer Protection Act, the TCPA. There are two main issues. First is whether an interpretation by the Communications Commission in a final order is binding in Federal District Courts under the Hobbs Act. And second, if it is binding and we think it is clear that it is, did the District Court in this case err in failing to follow the plain language of paragraph 52 of the FCC's 2006 order, which states that facsimiles that offer free goods or services, such as free publications, are advertisements under the TCPA's definition. Notably, during the briefing in this case, the Second Circuit Court of Appeals issued the first decision of any Court of Appeals applying that paragraph 52 in a case involving a fax offering free goods or services. That was Physicians House v. Bowdinger. We discussed it extensively in our reply brief because it was decided the day that our reply brief was filed. So I rewrite that brief that day. So the first question is uncontroversial. It should be the Hobbs Act question. This Court held in GTE South, Inc. v. Morrison in 1999 that the Hobbs Act, 28 U.S.C. 2342 subparagraph 1, vests exclusive jurisdiction to review FCC, a final order of the FCC, in the Circuit Court of Appeals with venue. That wasn't a TCPA case. It involved pricing rules, but a party tried to challenge them in private litigation, and this Court held it. Mr. Herr, do we need to decide that question given that it appears the District Court said even if your view of the Hobbs Act is correct, you went on to interpret the order in the context of this case and applied it adversely to your client. So why do we need to decide that? Well, the District Court could have said, I'm not going to decide the Hobbs Act question because even if you're right about it, the regulation doesn't, or the ruling doesn't say what you say. But he didn't. Chambers didn't do that and took the extra step to say, I affirmatively disagree with your part about the Hobbs Act, and I am free to review the validity of this ruling, and I refuse to defer to it under Chevron. I find it an unreasonable exercise of the FCC's authority. But didn't he then take the next step and say, but even if I'm wrong, here's why it doesn't apply in the context of this case? He did, and I will definitely address that. But first, the Court really has to reverse that Hobbs Act holding. It's important not only in TCPA cases, and not only in cases involving FCC orders, but if you look at 28 U.S.C. 2342, that's a jurisdiction channeling statute that best, it governs petitions for review of all kinds of different agency orders. The Surface Transportation Board, which used to be the Interstate Commerce Commission. The Atomic Energy Commission. The Secretary of Transportation. I mean, there are others in there. There are numerous ones that Congress intended to provide a specific procedure and invest jurisdiction for those sorts of challenges to an agency order in the Court of Appeals. And a good example of why that's done is the case that the District Court in this case cited for the proposition that he could review the validity of the FCC's 2006 ruling. They cited a Supreme Court case called Brand X. It's National Cable Communications Association versus Brand X, I don't know. But that was a Hobbs Act case. So the FCC issued a notice of rulemaking. It had to do with whether cable boxes were covered by the Telecommunications Act of 1996. All the interested parties came in, including everybody in the industry. They had parties who had participated in the rulemaking proceedings. Their Hobbs Act petitions for review in different circuit courts of appeal. Those were consolidated in the Ninth Circuit. The Ninth Circuit decided all of them with the input of the FCC and the Attorney General so that the agency issuing the regulation was there to defend itself, defend its reasoning, and to build a record in front of the agency. And then it went to the Supreme Court. So that's the way it's supposed to go. We're not supposed to have a District Court in West DC's ruling. And without the FCC even being here, I'm going to hold that it's invalid. There's also, at least I got a slight sense that the District Court's assessment of the validity of the regulation under Chevron affected the second part of the District Court's analysis. That the District Court was construing the regulation in order to avoid what the District Court believed was a Chevron problem that it had jurisdiction to decide. Do you read it differently? I think I agree. I might not have been that clear. I think you agree too. The way I've put it before is that the District Court knew that the ruling says what it says. It says that if a fax is offering free goods or services, or goods or services even at no cost, then it's an advertisement. It's presumed to be an advertisement. And I think what hung the District Court up, and it's hanging the defendants up too because they say it multiple times in their briefs, is that I'm seeking to ban all faxes that promote a free good or service. And that's not the case at all. The TCPA does not ban unsolicited fax advertisements. It provides certain rules that you have to comply with if you are going to send fax advertisements. And those are in Section 227B1C. You have to have an EBR with the recipient in an established business relationship. It's very easy to form any voluntary two-way communication between two parties agrees in EBR. You have to have obtained the recipient's fax number in a permissible way, including the voluntary communication of the number. But you can also get it from a database under certain circumstances, which I suspect is what the defendants in this case did. But we don't know because we had no discovery. And three, you have to include a compliant opt-out notice. A couple of lines of text at the bottom of your fax providing a toll-free telephone number and a fax number and advising the recipient that they have a right to opt out of receiving similar faxes in the future if they so choose. These are simple rules as Judge Easterbrook from the Seventh Circuit described them in Chapman v. First Index, which we cite in our brief. And generally fax advertisers comply with them. We see a lot of faxes that have compliant opt-out notices. And where they're sent to, where the defendant is careful to send them to persons with whom it has an established business relationship. We allege that that's not the case here. The defendants never answered the complaint, so we don't know if they're going to assert an EBR defense, let alone know where they got their list of fax numbers or anything like that. But just to be clear, what we're asking this court to hold with respect to the meaning of paragraph 52 of the 2006 order, we're asking this to follow Judge LaValle's current opinion in the Beringer case from the Second Circuit. Majority in that case reversed the district court's dismissal. It's another one of our cases, I argue, case before the Second Circuit. And it held, well, you do have to plead that the fax was a pretext or part of an overall marketing campaign, even in an operative for free goods and services. So in that respect, the court ruled against us. But it held at the pleading stage, since this fax is related to the defendant's business, the fax promoted a free seminar for doctors about a particular medical condition. And at that time, the defendant is a pharmaceutical manufacturer. And it was developing a drug to treat that condition, but the fax doesn't say anything about that drug. The drug hadn't been approved by the FDA. And it was not commercially available, which is why it got dismissed at the district court. And the Second Circuit said, well, it's plausible that there was a commercial purpose behind this fax, because the defendant's not a nonprofit corporation. It's a going concern. It's a commercial business. And generally, business entities don't send out faxes notifying people of a dinner meeting and sponsoring this thing at a restaurant, for no business purpose whatsoever. So you think you would win under that approach as well? Absolutely. That's our alternative. Just explain to me, in common sense, so the majority says, as long as there's some connection between the free good or service that's being offered and the defendant's line of business, that's good enough. So what's the connection here? Because I don't understand what this company does. I don't know exactly how it makes money. PDR publishes the e-book that was offered, a free copy of which was offered in the fax. The only thing in the record about it is one page from PDR's website that PDR asked the judge to take judicial notice of. But the fax itself, by the way, in the opt-out notice, it says that you're receiving information about health care products and services from PDR via fax. Because they say you're a member of the PDR network. My client says he doesn't know what they're talking about. But so PDR makes money somehow. It also said it's funded by the pharmaceutical companies. That's what the defendants represented to the district court in some manner. So maybe they get, maybe they're paid based on how many copies of the PDR they distribute. But basically you're saying close enough. They do something that has to do with prescribing medicine. This book is about prescribing drugs. We need discovery to figure out how they make their money. And under the majority approach in Behringer, we get it. Right. And under the majority approach in Behringer, just to be clear, there's a presumptive, the FCC's rule creates a presumption. They can rebut it. And the defendant can rebut it. Right. But we've gotten none of that. After discovery, the defendant can rebut it, right? Isn't that what the majority says? Correct. But you get past a motion to dismiss. Since all that information is in the hands of the defendants, we can't, in light of the remedial purpose of the statute and the regulations, even if the 2006 ruling doesn't mean on its plain language what we say it means, and we say it does, as Judge LaValle agreed, then at the very least we get past a motion to dismiss on the basis that it's plausible that this thing has a commercial purpose. And we get some reasonable discovery to figure, to answer that question. Mr. Herr, let me go back to the very beginning when we started talking about the Hobbs Act, because I'm still trying to wrap my arms around how this case or any other like this should have been handled by the district court. You seem to be suggesting that once your client or anyone similarly situated raises a Hobbs Act offense to this particular set of facts and the application of this regulation, that it's a full stop by the district court. They can't proceed any further. Is that right? That's correct. So no district court has subject matter jurisdiction under the Hobbs Act to consider, to determine the validity of a final order of the FCC. So in other words, the TCPA means what the FCC says it means, unless that party initiates a Hobbs Act procedure. They go to the FCC and they petition the FCC to either change its ruling or clarify it or rescind it as invalid. Once they get a ruling at the agency, the aggrieved party may appeal to a court of appeals in which venue is proper. And that's the circuit, the judicial circuit in which the petitioner resides or has its principal place of business or the DC Circuit Court of Appeals. You can always go there. So what was it about Beringer that made that case different? Because that wasn't a full stop. The district court went ahead and made a ruling. Yeah, everybody applied the ruling. It's just they misapplied it. But you're not saying that the district court's litigation... I'm sorry, you're not, your position isn't that this district court case had to end. I thought your position was the district court case doesn't come to a full stop. It's just that it proceeds from the assumption that this rule is valid. Absolutely. It has to be assumed to be valid in a district court. But not that the litigation has to end. And then if the defendant doesn't like that, proceeding under those circumstances, they can go to the FCC, they can seek a stay of the district court litigation if they want to. But it's not that the district court lacks jurisdiction to decide this case. It's just that the district court lacks jurisdiction to... No, no. The district court has jurisdiction to decide our TCPA claim under MIMS versus the Zero Financial Services Supreme Court case from 2012. This is a private right of action under the statute, and district courts have jurisdiction to do that. Sorry if I misunderstood. I understand that. Thank you. Mr. Rosenthal. Good morning. May it please the Court. My name is Jeffrey Rosenthal, and I represent the appellees, PDR Network, PDR Distribution, and PDR Equity. And I wanted to begin my presentation by addressing some of the points that my colleague, Mr. Hauer, raised, if I might. I'm happy to report, actually, that I agree with at least one thing that Mr. Hauer said, so we're off to a good start, which is that the TCPA does not ban all faxes. It doesn't address faxes that are not advertisements, which is really the core of this case. And the reason why the district court's order was correct, and the reason why this case should be dismissed. The fax at issue in this case by my client, PDR, is not an advertisement because there's no commercial nexus. There's no way in which this fax results in any income to my client. Your client is a for-profit, right? It is a for-profit. That's out of the goodness of its heart. It wants to make the world a better place. It's giving stuff away. In a sense, yes, it is a for-profit, but it is actually trying to make the world a better place because what its product is is this PDR. It's confusing because the company's name is PDR and the book is also called PDR, but it stands for Physician's Desk Reference. It's that big phone book-looking book that we've all seen in our doctor's offices that talks about drug interactions. That book is free to all physicians, including the plaintiff, Carlton and Harris, which is the chiropractic office. That book is free to them. The fax informs plaintiffs, like physicians, like plaintiffs, that attention. For 2014, there's an e-version of this book. There's a free version that can be downloaded so that every doctor can pull up their iPad and have the PDR right there with them. That is a free service. The only thing the fax informs the recipient is that reserve a copy of it. Let us know how many you're going to download. Do you need one copy for your office? Do you need 10 copies? It doesn't matter because there's no exchange of money between the recipient physician and PDR. Not yet, but the Second Circuit held that just as a matter of common sense, we can generally presume, maybe it's rebuttable, maybe there's like the unicorn for-profit out there that genuinely is just giving stuff away without it being down the road some kind of a tie-in for a profit for the company. We can just, as a matter of common sense, assume that usually that's not how it works, so let's have some discovery and you guys can rebut that very good common sense presumption. If it turns out this is the one in a million case where a for-profit company is giving things away and it is not part of some larger marketing effort. Two points to that, Your Honor. First is you're absolutely right. Common sense does factor into the analysis of the TCPA, the language about advertising and what that means, which requires a for-profit exchange for the purposes of that fax. The second point, which is related, and I'll get to Bollinger in a moment, because it is relevant to our case in the Second Circuit, is that Chief Judge Chambers and many district courts and circuit courts have said, including Sandusky, which is a cornerstone of this argument, which I'm again shocked we haven't heard from plaintiffs in their briefing or even today, but downstream ancillary economic benefit is just not sufficient. There has to be a clear connection between you sent this fax to make this, to sell this product, to make this quantity. That's how you read the FCC's regulation, requiring that? Can I address the second part of Bollinger and then I'll get to the FCC's order because I think they do interrelate. Okay, but wasn't Bollinger construing the FCC's order? Yes. So Bollinger construes the FCC's order. An important thing about Bollinger is that, yes, the Second Circuit, the majority says not every fax is going to be per se an advertisement. I think the parties agree on that. I think the majority is clear. This issue about the judge-level concurrence, it's a concurrence. It is not the law. It has not been applied in any case since. I think your colleague was suggesting it's binding precedent. I think what your colleague was saying is that it's persuasive because, honestly, when you look at the regulation, it sure seems on its face to be saying this is a per se rule. If a for-profit company is sending around offers of free goods and services, that's a commercial advertisement. So even taking that presumption, even the majority of Bollinger said it is not per se. At best, there's a judge-level and this concurrence raises a presumption, and I'll get to that presumption in a second. When you look at the language of the statute itself, which Judge Lovell did, which the Bollinger court did, and which Sandusky also did. Why are we looking at the language of the statute? I'm sorry. I meant to say the regulation. Okay. Right, right. Well, the first point I was going to make is that the first step in this process is to look at the language of the statute. To look at the term advertising as stated in the statute, 227A5, which requires a commercial connection. And if the language is clear, which is what the Sixth Circuit in Sandusky said and what Chief Judge Chamber said in our district court case, if that language is clear, that's the end of the investment. Even in the face of an FCC order that suggests otherwise? I believe that's right. Then you've got the Hobbs Act problem. Right. So to address the Hobbs Act, I think, Your Honors, at least I think I was hearing that we have never sought to use – we have never sought to challenge the validity of an FCC order. And that's where I'm still confused that we're talking about the Hobbs Act because Chief Judge Chambers was very clear in his opinion that we're not challenging the validity of this ruling. It says what it says. But there's a lot of cases construing the Hobbs Act that say it doesn't really matter whether litigation is styled as a challenge to the validity of an FCC regulation. That district courts, nevertheless, whether it's styled that way or not, they lack the jurisdiction to do exactly what this district court did and say, I don't think this regulation is consistent with the statute. District courts can't do that or you end up with, you know, a hundred different rulings on the validity of an FCC. There's the order. There's an ad hoc process in place for taking care of this. And so I don't think it matters whether you came to court or brought to court and said, here's what we're here for. We're all about challenging the validity of this rule. You're stuck with the rule for purposes of this district court action. I don't see how you can argue differently. Right. So if I might address that. Yeah. Again, I think the first step in every statutory analysis is whether the statute is clear and unambiguous on its face. No. Not in this context. When I say – I'm saying the statute of the TCPA. If the court decides, as the district court did, to look at the FCC's ruling, it is not challenging the validity. Hobbs Act only affects the validity. Whether the ruling itself – The federal rule is inconsistent with the statute under which it was promulgated is to say that it is invalid. So I don't understand how a district court under the Hobbs Act has jurisdiction to deem a regulation invalid. Because the district court – our district court, Chief Judge Chambers, wasn't saying that it's inconsistent. He was reading them in harmony, and that's what his opinion says. He says – No, no, no. He says the district court is not obliged to defer to the FCC's interpretation of an unambiguous statute. Right. Defer to. So in a sense, it doesn't have to – Yes. I can ignore it, basically, is what he's saying. He's saying, as the Sixth Circuit and Sandusky said, that, you know, you take an unambiguous statute, that's the first starting point. What our district court did was it applied the statute. It said, I will look at the FCC – I'm sorry, the regulation. It applied the regulation. It said the regulation has the word promote in it. Promote has a meaning. You do not read the district court as sort of doing two alternative things. First saying, look, the Hobbs Act does not require a federal court to adopt an FCC interpretation of the TCPA. Let's assume for a minute I think that is just wrong. I thought your argument was, well, bygones, because then the district court turns around and says, even if I do have to accept it, I still don't think it means what the plaintiffs say. I thought you were arguing that those are sort of two alternative holdings, and we don't have to mess with the first one because we have that second one. But that's not what you're saying. You're saying the first one is right. The Hobbs Act does not require a federal court to adopt an FCC interpretation of the TCPA. You think that is correct? What I'm saying – I'm saying neither of those are erroneous. I think it's correct to say that you can, as district court did and as other courts have done, you can look at the language of the statute and say, is this unambiguous? The other part you're referring to is Sandusky. Sandusky. Did anyone raise the Hobbs Act problem in Sandusky? Because the opinion does not discuss it.  The Hobbs Act is not specifically raised in Sandusky. So it's not that that's consistent with the Hobbs Act. That's fair. Right. So Sandusky does not say the Hobbs Act does or does not apply. But there are other courts, and we cited them in our briefing, where district courts are saying you can apply an FCC ruling without challenging its validity. And that's exactly what Judge Chambers did. Sure, you can. When he applied the FCC ruling, a regulation in our case, he still found there's a requirement of promote. You must promote goods and services, even if it's free. For that reason, it was a correct ruling, whether he's saying in the alternative or whether he's saying, you know, as an initial matter, without that promotion, without that commercial connection, without that nexus, there can be no advertisement, there can be no TCPA violation because there's nothing being sold, there's no for-profit being exchanged, and they're just – that's where this whole case falls apart. But do you think that that's what the FCC thinks, that if there's not a sale of a good, it's not a commercial advertisement? Because that doesn't seem to be what the regulation says. So the regulation, even to use Judge Lovell's concurrent language, is a rambling 22-page discussion of this aspect of the TCPA as it relates to what is a free good and service. And part of the reason that the Bollinger case really is unhelpful here is that is a free seminar. That fax was relating to a free seminar, a second step. Come to a free seminar. Maybe at the free seminar we'll talk about products that we, Bollinger, sells and, you know, makes profit from. Let me ask you, you said that this is a rambling order, and I guess in some respects that's correct. But what is unclear about this language? The commission concludes that facsimile messages that promote goods or services, even at no cost, such as free magazines, descriptions, catalogs, free consultations or seminars, are unsolicited advertisements under the TCPA. That's pretty clear. Again, Your Honor, I was using Judge Lovell's, his own description of it. I'm reading the regulation. Right. That seems very clear to me. So that language, again, has that key term promote in it. And that is the part where you come right back to. That's how you harmonize the FCC regulation with the TCPA, because promote has a commercial aspect, which brings you right back to however you. No, it's promote even at no cost. So that's what, taken literally, that's what your client did. So what my client did was it was a promotion of information. At no cost. Correct. There is no cost. Why doesn't that apply? Why doesn't that fax? Why doesn't this order apply to that fax? The order doesn't apply to this fax because the promotion has to relate to the commercial selling of a good. Where do you see that in the regulation? So to address the regulation, the next couple sentences in that paragraph talks about, for example, or such as free seminars, such as. How does your company, PDR, make money? Sure. If I could just finish the last point, and then there's, which comes to this answer as well. And in the very next paragraph, after the one that Your Honor just read, it says if a company is promoting nothing but information, or if it's conveying nothing but information, that's not an advertisement. So I just wanted to put the end piece on that, which is the very next paragraph. So PDR's business model, which we do describe in our briefing. And, again, you don't have to take my word for it. There's a federal judge, I believe in the District of New Mexico, who observed that PDR's business model involves pharmaceutical companies contributing, paying PDR to include their prescription interactions in the physician's desk reference book. So I'm a drug company, and I say I make Jeffanol. You make money from the pharmaceutical companies, not from the doctors who are receiving this free manual. And that's a vital distinction. And the reason that is so important, again, that distinguishes Bollinger from our case, is that Bollinger said that it was a pharmaceutical company sending a free seminar fax to a potential customer, the actual doctors who could prescribe this drug that Bollinger made. That's completely different here. PDR does not make any of the drugs in the physician's desk reference. It doesn't sell the physician's desk reference to physicians. But when it goes to the people who advertise, the pharmaceutical companies who advertise in its PDR, does it say how many doctors get that PDR? I mean, doesn't it make money off the audience it can bring, its advertisers? Right. So the purpose of the PDR, the reason that the pharmaceutical companies want their drugs included in the PDR, is not because it has the largest reach necessarily. It's because when, God forbid, a drug interaction happens, or someone, a doctor prescribes drug A and has a reaction to drug B, when there's a failure to warn suit brought by that patient who was harmed against the drug company, they turn around and say, well, we've publicized this. We put it in the physician's desk reference. Your physician had it. We as a drug company are not responsible for your physician not reading our book that says don't put A and B together. You're going to have reaction C. That's where PDR, the company, that's its business model. So the pharmaceutical companies are incentivized to have the PDR contained in the patient. This isn't in the record, right? This is not in the record. All we have is that thing, the judicial notice of the one page. So we have both the judicial notice of the one page from PDR's website, but, again, the record does include the other case from the District of New Mexico, which says, and we cited, we certainly cited in our district court briefing, I believe it's also cited at the appellate before your honors, that pharmaceutical companies are the ones who are supplying this information. So you don't have to take my word for it. You can either look at our website, which Chief Judge Changer took judicial notice of, or you can take the other court's reputation. Or another alternative would be Discovery. So the reason, and thank you for bringing that up, Corinna. You're welcome. The reason we feel that Discovery really would not be effective in this case or really change anything is you look at the four corners of the facts, and the four corners of the facts, as I've described, is a free book, the PDR, and a free e-book that can be downloaded. You don't need to go any further than the four corners of the facts to know that there's no commercial exchange happening here. This is not a free seminar case. This is not a free sample case where a company is saying, come to a free seminar, and then at the seminar they start hitting you with the, and buy this, and buy this drug that we make. So there's no second step here. What about the advertisement in the book? So I'll address that. I believe your honor is referring to the pharmacy discount card. Correct? The motion to amend the complaint that referred in turn, yes, to the discount card. Well, there was no, correct. We're talking about the same thing, but there was no motion to amend the complaint. Was there a motion to take judicial notice? We fought, defended. It was a separate motion. It wasn't part of your motion. Correct. The defendant fought a motion to take judicial notice of that one-paragraph web page. It was a separate motion. It was not included in your motion to dismiss. Correct. We had a motion dismissed, which was granted, and we had a motion for judicial notice, which was also granted. But the PDR discount card is actually a good example of why discovery is not necessary in this case. That was plaintiff kind of reaching outside the pleadings themselves, and that was trying to say, well, aha, here's this PDR discount card, and that's how PDR is making their money. Unfortunately for plaintiffs, that's incorrect. The PDR discount card, and I'll address how I know that. Well, I don't want you to address how you know it. I want you to address how I know it, since there's been no discovery or fact-finding. Right. So the way that the court knew it, this court and also Chief Judge Chambers, the reason that was before him was we had an affidavit prepared by someone at PDR who said. . . You can't litigate a motion to dismiss with all these, like, affidavits about facts that aren't in the record. Why doesn't this mean we need discovery? Well, the only reason we had to put that affidavit in was because without a motion to amend or anything in the pleadings, plaintiffs expanded beyond their complaint and said, oh, here's the PDR, here's the pharmacy discount card. They sought leave to amend in order to bring that information in. They didn't just throw it out there. They said we would like, if you think a commercial nexus is required, if you think that's the hole in our case, we're prepared to amend our complaint. We're seeking leave to amend. We're giving you the reasons why we can fill that gap. And I don't see how you get to come back and argue futility based on facts that aren't in the record. Right. And, Your Honor, just to address, put a finer point on it. Plaintiffs did not seek leave to amend. They added a footnote somewhere in their brief that says, oh, we would like to amend, which is not the proper vehicle to do so. But, again, because this is a single-action fax, it is a here's a free book that can be downloaded. It is not a come to a free seminar. It is not a free sample to be purchased later. That's why the example of the PDR pharmacy card, which, again, we described through an affidavit, which we had to put something in because otherwise it's left unchallenged, which plaintiffs is wrong about, is the PDR pharmacy discount card is a free card that PDR provides to physicians to give to their patients. There's no exchange of any income or there's no revenue exchange in relation to the PDR pharmacy card, just like there's no exchange for the PDR book, just like there's no exchange for the PDR e-book. There is no commercial nexus between the sending of this fax, which is not an advertisement, and any revenue generated by PDR. It is that fundamental distinction that takes Boeinger out of the running, which, again, that was a free seminar case where they sell you something later. And there's another reason why discovery is not needed. There are other district courts that have found, again, four corners of the fax. They say there's nothing here, and it's something else that happens that causes the district court to say, you know what, let's take another look at this. And the two examples that I wanted to provide to you was in the Janssen case, which is a pharmaceutical company making drugs that they themselves sold and advertising it in a fax. The district court first granted the motion to dismiss, said, yeah, there's nothing here, four corners of the fax, no allegations. But then later there was a reclassification of a drug, and maybe now it could be sold or there's some change, and that's why that court granted reconsideration and actually went back and said, okay, I'm going to deny my motion and go do some discovery. We don't have anything like that here. And the other example is Greyhouse Publishing. So that was a company that was selling a directory that said, for free, we'd like to include you in our directory of best whatevers in the country. I'm sure we've all received it sometime. And that fax in and of itself, the four corners, free directory, be included in it, not a commercial transaction. But when follow-up e-mails were sent to the same recipient, we're going to now sell you that book. We're going to make some money off of you being in this directory. That's where the court said, okay, I've got enough here that it makes sense to step away from these pleadings and do some discovery. Plausibility is the standard. There is no plausible connection. Even on the record that before even the motion practice with the affidavit that we were forced to put in because plaintiff had just incorrectly made assertions that were not factually supported and not in their pleading, that's how we get to the point where we're at. I see I have a few moments left. If there's any other questions, I'm happy to address them. And thank you for your time. Thank you. Thank you. Thank you, Your Honor. If I could start with the argument that we didn't seek leave to amend our complaint to make allegations about the PDR network card. That's in our response to the motion to dismiss. It's at the appendix, page 66. We talked about in detail what we were able to find about the PDR network card in the 2015 e-book, which I was able to find online, but I couldn't find the 2014 e-book. That was the subject of the fact. But you didn't make a motion to amend. Nope. I did it in my response. I brought it up at the hearing, and I specifically asked Judge Chambers for leave to amend, and then the order on the motion to dismiss ignored it. But I said here, if you determine that plaintiff must plead the facts attached to the complaint as part of an overall marketing campaign, which plaintiff maintains is not required, then plaintiff seeks leave to amend to allege the facts as part of an overall marketing campaign for the PDR pharmacy discount card or other products, goods, and services promoted in the 2014 PDR e-book, which, of course, plaintiff has not yet obtained in discovery. I've never seen a copy of the free publication that's actually promoted in the facts. We would like to see a copy of that document before our case is dismissed, saying that it has no merit whatsoever. The two cases, the two district court cases my colleague just mentioned, Janssen, that's one of my firm's cases, initially the district court did dismiss. He granted reconsideration. And then we later defeated the defendant's motion for summary judgment after we obtained discovery, which showed that the facts, although on its face, had no commercial purpose. It was just updating people about what drugs were on this list, this insurance list. The facts originated in the marketing department, and the purpose it was sent was in order to try to boost sales of this particular drug in certain geographic regions where they thought their sales were lagging. You would never know that from the face of the facts. You need discovery to see that. As the Janssen court held, as Stryker held, and even as the Sixth Circuit held in Medco, another one of our cases which I argued which we lost, but the court in that case did not hold. You only look at the four corners of the facts, as the defense counsel just stated. It did not hold that at all. That was on summary judgment. We got discovery in that case. Medco is also not a free goods or services case. It does not implicate paragraph 52 of the 2006 FCC order. That is a specific agency ruling on exactly the facts that we have before us. We cited numerous cases from this circuit and the First Circuit holding that. In the agency rulings context, the specific trumps the general. So if you have a specific ruling saying facts is offering free goods and services, we're going to treat them as advertisements, you can't use general language from other parts of the 2006 order about purely informational communications to overrule that specific rule. Under your theory of the case, Mr. Harrow, would it matter if PDR were, in fact, a nonprofit entity? I don't think it should matter at the motion to dismiss stage. Now, whether you can argue, no. You know what, I take that back entirely. It makes no difference whatsoever because paragraph 52 of the 2006 order says what it says. A facts offering free goods and services is presumed to be an advertisement. Maybe the Second Circuit, maybe under the Second Circuit's majority ruling, if the court were to adopt that, the defendant could rebut that later and show there was no commercial purpose or business purpose, I think is the language the Second Circuit majority used. Under Judge LaValle's concurrence, which is what we're urging the court to adopt, no. The facts is an advertisement. That means, again, I have to stress that does not mean it's unlawful necessarily. A facts, well, this facts is unlawful because the opt-out notice is woefully not compliant. But it does not mean nobody can ever send facts, unsolicited facts, advertising free goods or services. You just have to comply with the safe harbor and the statute. You need to use compliant opt-out notice. You need to send it to persons with whom you have an EBR. And you need to have obtained the facts numbers in a permissible way. Those are the rules for facts advertising. Judge LaValle thought it might come out differently if it was a non-profit. The concurring opinion says I don't think this actually applies to non-profits. Because if you read the rest of the order, it's pretty clear that the order intends them to be treated differently. I think that was his conclusion. You think that is not right? I think that's wrong. You want us to adopt part but not all of the concurrence? I'm really just trying to get a handle on what your position is. If this was a case where the defendant was arguing that it was a non-profit corporation, the court would have to address that question. But it doesn't happen here because PDR is not a non-profit corporation. All of the facts about I didn't know PDR is paid by the pharmaceutical companies to include their medications in the PDR. I didn't know that. I'd like to depose somebody about how exactly that arrangement works. If there's a method for, if there's a formula for how much they're paid, if it's a flat fee, I don't know. I think those are important facts that I would like some discovery into. The arguments about the medicines, the pharmaceuticals in the PDR, that PDR doesn't actually sell those things, that doesn't matter. That addresses a different question for TCPA liability, which is whether the defendant is the sender of the facts. The sender is defined by a separate FCC regulation. It's usually not the person who physically sends the transmit button. It's the person on whose behalf the facts is transmitted or whose goods or services are advertised. So it really, your products do not need to be for sale in the facts in order to be the sender. It just needs to be sent on your behalf. Or it can advertise your goods or services. It's an either or. But it has nothing to do with whether it's an advertisement or not. The argument that the defendants aren't seeking to challenge the validity of paragraph 52 really doesn't hold water. And defendants and plaintiffs have made this argument in other cases. My firm was on the other side in the CE design case in the Seventh Circuit several years ago. It was before I was at that firm. But we were trying to get out of a different FCC rule. And the Seventh Circuit said, no, you can't. We said, we're not asking you to invalidate it. We're asking you to harmonize it with the statute. And we're asking you to make sense of it. And the Seventh Circuit said, no, you're asking us to ignore it, which is exactly the word Judge Dee has used. And that's the same thing as invalidating it or enjoining it or setting it aside or something else. And it makes no difference that it arises in the context of a private TCPA case. We have four circuit cases, Matt. Mayus in the Eleventh Circuit, CE design in the Seventh, Lease in the Sixth, and Knack v. Wahlberg in the Eighth. We cite them all in our briefs in the district court, and the district court ignored all of them. If there's no more questions, your Honor. Thank you. Thank you very much. The cases have been argued and presented to the court. We'll come down and greet counsel and stand in recess until 830 tomorrow morning.
judges: Albert Diaz, Stephanie D. Thacker, Pamela A. Harris